District Court Judges for giving us their time to help us with our calendar, particularly given how busy they are.  It's a pleasure to be here. So we have a single matter, all counsel are present, let's begin. Good morning and may it please the Court. My name is Robin Alperstein and I represent the Plaintiff's Appellants. In their papers, defendants complain on the very first page of their brief and I quote that the only connections to New York or the United States for that matter are financial. And yes, the predicate crimes that we plead are mostly financial. The second amended complaint alleges that the defendants stole money directly out of U.S. bank accounts and by using the U.S. mails and wires to effectuate those thefts. Defendants say that more is needed. And so this is really the question before the Court this morning. Is defendant's theft of money directly out of U.S. bank accounts by lying to a U.S. bank and using the U.S. mails and wires to effectuate those thefts a domestic application of the mail, bank and wire fraud statutes? Well, I have a question because I'm troubled by Appellant's arguments in view of the Second Circuit's earlier decision in this case. So the Court said in that decision and made it very clear that simply transporting money into bank accounts in the United States is not enough to establish a domestic injury. Where is the domestic injury here? The allegations in the complaint, as I understand them, are that these companies did a number of different things, that the defendants in this case used these sham companies for purposes of generating fees, for purposes of buying and selling companies. And that all happened outside of the United States. And it seems to me the only difference between this complaint and the prior complaint is that you're now alleging that when the money was transferred into the United States, it goes into an account that, though defendants claimed ownership, it really belonged to the plaintiffs, and then they transferred it from plaintiff's account to a defendant account. Is that the injury you're alleging, and is that sufficient under the Second Circuit's prior opinion? The difference between the complaints and the opinions is that what was dismissed prior was essentially pled as a laundering claim. We now have information in that set forth in the Second Amended Complaint that the accounts were owned by the estate, the Tarascona, New York, accounts, 11 of them, and the Finterre, New York, estate — excuse me, account, were both — or all 11 accounts were the property of the estate at the time they were stolen out of New York. That is the key distinction. The injury is the theft out of a U.S. bank account. It's not simply the transfer. Your allegation, counsel, is that the fraud that generated that money that was then transferred into a New York account owned by plaintiffs, that's not the injury here, but the injury is really taking the money from plaintiff's account in New York and then sending it into defendant's account? Absolutely, Judge. The injury is the theft of property. Under the statute, under the mail and wire fraud statutes, for example, the question is whether the money — whether money was taken from the plaintiff. And the domestic injury test is also whether the money was taken, was the plaintiff parted from his or her property. Well, it's hard to see — it's hard to see how the fraud causes the plaintiff any injury if the money is deposited in accounts that are in his name, which — in New York, which is what your allegations are, aren't they? Well, the injury is that the money was —  Just stay with me for a second. Pardon me, Judge. The fraud is meaningless, isn't it? I mean, there are allegations of offshore activity, like the purchase of Finterre stock from El Saca, and then the money comes into an account in New York. But the money is in an account in Vasconin's name, right? That's correct. And then it's stolen from that account. Right. So what's the relevance of the fraud at all? I mean, I have trouble — this is not a hostile question, I might add. I don't understand the relevance of the fraud if the defalcation, if the taking occurs in New York. Say the money had never left Vasconin's account in New York. Notwithstanding what you think is a manipulation of the relationship offshore, Vasconin's still got the money, right? If he still had the money, we wouldn't be here. There would be no fraud. There would be no injury. But he doesn't have the money because the defendants transferred the funds out of the plaintiff's account in New York into their own account. So why New York? Why was it important — I mean, I understand that there were accounts here and the Afghan trust was here and some of the other things. But why was it important to do — in your view, why was it important that these transactions occur, the ultimate thefts, as you refer to them, not saying that you're right or not. Why was it important that they happened in New York? As opposed to in Chile from the — Anyplace. Paris, London, wherever. The shares started out here. Half the plaintiff's fortune was inherited by him, and it was in New York at the time. He had — at the time that he inherited the money, half of it was located in New York. So that was a natural place. I can't get into the defendant's head, but I do know that the plaintiff was very, very well known in Chile. His accounts were known in Chile. The bank officers knew his accounts were his. And had it happened in Chile, people would have been alerted immediately to the fact that something was up. Moving it into New York, where he — where the defendant had the authority to at least move the money around through intra-estate transfers allowed him the cover of acting on — He also had the power of attorney here, so he could make any transactions he wanted here in your client's name without anybody asking him anything. That is correct. The distinction, of course, is that he had the power of attorney to make investments or to make transfers on behalf of the plaintiff, but he didn't have the power to take the money away from the plaintiff for himself. Which is exactly what happened here. If we thought of this as an embezzlement, and I know it's a scheme to defraud, but there'd be an argument — and help me understand just when this fraud takes place. So for embezzlement, you need an intent to defraud, convert to your own use property of another that was initially lawfully in your possession. And the conversion takes place when there's a serious interference with the property. To the extent that the complaint says there was a concealment from your client of the fact that these nominee accounts in the estate's name were being opened in New York, and the money was put in those accounts all from the beginning with the idea, we're going to take them out. Isn't there an argument that it took place in Chile? That the injury took place when the money left Chile and went into the accounts, even though they were estate accounts? I think the answer to that is no, Your Honor, and the reason is this. If the money had stayed in New York, there'd be no injury. There'd be no theft. It would just be a pool of money that my client could access at any time. Your client, they were his — they were estate accounts, so he could get the money out himself. Correct. And under this — under the Second Circuit's test in this very case, the test for a domestic injury, of course, is was the property located in the United States at the time of the misappropriation or the injury? The answer to that test is quite straightforward. The district court here basically ignored that and instead said, well, what happened before the money came here? But the issue is where was the money at the time of the injury? Where was the property? But didn't the district judge ask you that question because of the allegations in your complaint? Your complaint allegations are that there was this scheme, and part of the scheme is that all of these companies did A, B, C, D. The Afghan Trust Company did this. The Fintier misappropriation, you explained how all of that happened. And that all happened outside the United States. So isn't that also misappropriation of the funds? We agree that the accounts were all owned by plaintiff at this time. He was using plaintiff's funds to do this. But when he's taken those actions, is that not a misappropriation? No, Your Honor. And, in fact, in a declaration that the defendant submitted in this very case, he defended originally by saying there's nothing wrong with what I did because — because anything that happened in the United States at the time was actually owned by the estate. And so anything I did doesn't matter because the real problem was that it was owned by the estate. So that's what he used to defend himself. So they can't really have it both ways. And that's with regard to both the Fintier and the Terrascona accounts? Fintier, there's the declaration, but also Terrascona? The declaration does not address the Terrascona accounts, Your Honor. But I would also add that under the Second Circuit's Petrolios case, which did precede Nabisco, the Court was looking at whether the — whether the fraud was directed to or from the United States. And if we go back to the focus of the statute and the statute itself and the elements of a wire and mail fraud claim, we see that it's not simply the fraud. It's also what is the object of the fraud, and what is — and were the mails and wires used in furtherance of parting the plaintiff from the property? And here the property was in New York. Every single aspect of the scheme, the uses of — the lies to Morgan Stanley, the direction of the property, the emails, the faxes, the wire transfers, the letters, the authorizations, every single one of those went into employees at U.S. banks at Morgan Stanley and UBS. All of that was directed to people in the United States. So help me understand, counsel. I understand that all to go to the predicate acts, right? Yeah. And the fact that maybe you can show that the predicate acts, in fact, did take place in the United States, so that there is a domestic angle to your mail fraud, wire fraud, and all of that. But isn't that a separate issue from whether or not your client has suffered a domestic injury for purposes of whether or not the RICO statute can even be enforced? They are two separate questions. The question of domestic injury goes back to the Second Circuit test in this case, which simply says where was the property located at the time of the injury. The answer to that question is the property was located at U.S. banks in UBS and Morgan Stanley. So the answer to that question is yes, and we have alleged domestic injuries. So that's the one piece. So that goes back to Judge Wesley's question. I'm really not giving you a hard time. I'm just trying to — And I'm sorry, but — — to appreciate and understand the argument that you're making. You seem to be saying that despite all of the allegations in the complaint as to all of these fraudulent activities that took place outside of the U.S., either in the BVI or in Chile or other places, that they're all irrelevant. And the only thing that matters, ultimately, is that defendants transferred funds into a New York account that was owned by plaintiffs, and that's the difference between this complaint and the prior complaint. And therefore, the then-transfer from those accounts in New York to defendants' accounts is the theft at issue here. And because that happened in the United States, the injury is domestic. Did I understand that correctly? I don't think exactly, Your Honor. I think that there's also maybe a disconnect between what constitutes — what we're alleging is a domestic conduct and maybe a conflation with that and domestic injury. So let me see if I can pull it out. It is a separate question whether the plaintiff was injured in New York. And the question of where certain fraudulent activity occurred is not relevant to the question of where the injury happened. So I think there's been a — And it's not why. Because of this Court's own test that said what you look at is where was the property located when the injury occurred. And the question of — And this Court also said that simply using accounts in New York for purposes of transferring money is not enough to allege a domestic injury, in that same opinion. So I'm trying to understand the distinction you're drawing here between the schemes that is then taken out by the defendants, and why doesn't that fall under the Court's definition of simply money laundering pursuant to this Court's prior opinion in this case? Because in the prior opinion, the question was whether the money was transferred to the United States after it had been taken in Chile. At the time, we did not know that Finterre was owned by the estate. So we did not — we thought that Finterre was always owned by the defendant. We thought the money was taken from Chile. And we were mistaken. That's what makes it — that's what makes it different. What — if it's his — Yes. If it's his and it's here, then if it's stolen, it has to have been stolen here. Correct. And I think that's the key — and thank — I think, Judge Brody, that's really the key distinction between the complaint now and all the cases of domestic injury cases that the defendants are relying on. So let me ask you one other clarification, if I can. Certainly. So with regard to the initial trust account that the court originally found did, in fact, satisfy the domestic injury standard, that money was taken from the Afghan trust, transferred to the Capri trust, right? And both were owned by plaintiff at the time. Is that not true? That is true. But if the money had come from the Afghan trust originally, if it had been stolen directly from the Afghan trust, we don't know where the money started out before. The question is, the court said that was a domestic injury, and the transfer wasn't from plaintiff to defendants. The transfer was from plaintiff to plaintiff, because plaintiff owned both the Afghan trust and the Capri trust. That wasn't the injury, Judge. The injury in the Capri — with the Capri Star Trust was the transfer of funds out of the Capri Star Trust to — Not according to this opinion. According to both the opinion and the complaint, Judge, because what we allege in both cases is that sham fees were generated out of the Capri Star Trust, the funds that were the source of the injuries, as we have alleged in the complaint and in our papers. The injury there came not in the transfer from the estate to the estate. We'd have no claim if simply money went from the Afghan trust, owned by the plaintiff, to the Capri Star Trust, owned by the plaintiff. The injury came when the sham fees from the Capri Star Trust were used as an excuse to take money out of that trust and give it to the defendants and the co-conspirators. It was when the estate was parted with the money. That's the injury. Can I ask about the management fees? I mean, you say — Yes. — acknowledge. You don't know the situs of those funds. Is the theory there that we read the complaint as a whole, and given the allegations about domestic injury, where you have more specifics, there's enough here that you should be able to get past 12b-6? Yes. But if it were standing on its own, I would not answer yes. It's in connection with all the other schemes, the FinTERR, the Terrascona, the use of these, you know, setting up entities, and then — which are all shams, I might add. I should probably also add that all of these companies were basically alter egos of Daniel's, and they were shams pursuant to which — that were, you know, pursuant to which, and that he used to take money from the estate and move it to himself and his co-conspirators. And that was done by taking money from the plaintiffs in the United States. Judge, Judge Livingston asked you earlier on that, that in essence, even though they were placed in his name, this was just a maneuver with regard to ultimately putting the money into El Saca's name. Did I misunderstand that question? Was that part of the allegations in the complaint, that with regard to some of the FinTERR, the FinTERR transactions, that even though it was in Vasconen's name, that these were really just created as part of the ruse, that these accounts were created as part of the ruse to then move the money into Vasconen's name? Am I misreading that? I don't think you're misreading it. The entirety of the scam was to take money from my clients and put it into the pockets of the defendants at a high level. There were fraudulent means used to do that. But the specific connection to the United States and what makes it a domestic activity is the fact that the wires were, not just the wires, but the fraud itself was directed at property that was located here. It's true that the defendants helped put the property here, although the shares, the bearer shares that were also stolen out of the United States, out of the J.P. Morgan safety deposit box, were also placed here by an agent of my client. They were somewhere else before, too. Well, what about the FinTERR accounts that were created by the defendant and money was then taken out? The money was taken out of New York, out of the FinTERR account in New York, correct? But weren't those accounts created by the defendant? And didn't the court also said in the prior opinion that with regard to the creation by the defendant for purposes of putting money into those accounts, it falls within the definition of money laundering. And this is not a case where plaintiff had these accounts sitting there, as with the Afghan trust, where defendant then went in and took the money and therefore there's an injury. This is defendant creating these accounts in New York for purposes of then putting money into them and taking them out. With respect, Judge, it's not a money laundering claim and that's the distinction again. So the fact that the defendant under a power of attorney created an account, which he was client did it himself or did it through the agent is really not relevant to the inquiry, either to the fraud or to the injury, because the theft occurred in New York. The fact that the plaintiff said, excuse me, the defendant decided to put the money here and then steal it from here is really the issue. If he had done the same thing but in Chile, if he created the false account in Chile and stolen the money from Chile, we would not be here. But what happened was he used the power of attorney, which he could do. He could make intra-estate transfers. He could set up other companies with my client's money. What he couldn't do was steal that money. And what he also couldn't do was decide to pick the United States as a jurisdiction and then take the money. And if my client had put the money here himself or another agent had, as with the Afghan trust, it would make no difference because the issue is that the money was stolen from within the U.S. borders. And I would add, too, Your Honor, that when you look at this conduct, when you look at what stepped back and looked at what happened here, this is fundamentally a theft scheme. It's a misappropriation scheme. It's targeted money that is held in U.S. accounts. It's lying to U.S. banking representatives. It's sending e-mails in here, faxes here, wire authorizations here, fictitious wire transfer authorizations. It's calling up these bank employees in the United States and saying, hey, do my bidding, and everyone in the United States at these banks just doing it. This is money that's supposed to be protected by U.S. law. And the fact that the defendants clicked a mouse when they did it in Santiago instead of doing it from, you know, a desk on Sixth Avenue shouldn't make the difference. The issue is that this is money in a U.S. bank account, and the use of these wires and mails to take that money. And the money, the injury occurred when the money was stolen out of those accounts. Thank you. You've reserved some rebuttal. I have. Thank you very much. I'll proceed. Good afternoon, and may it please the Court. My name is David Flugman from Salendi and Gay, and I represent the defendants. We discussed a brief while ago the dual requirements of RGR and Obispo, domestic injury and domestic conduct, and those are independent inquiries. And as we explain in our papers, we think the plaintiffs failed to satisfy both in different respects here. With respect to the domestic injury requirement, which is what we've been discussing, the plaintiff's own second amended complaint here alleges that the defendants misappropriated the funds that belonged to the plaintiff from Chile, then moved them into New York as part of a global scheme to defraud the plaintiffs. It put into accounts that the plaintiffs had access to. That's right, Your Honor. But the plaintiff actually — Why doesn't that make all the difference? Well, first of all, as a matter of fact, and as they allege, the plaintiffs don't necessarily have access to those accounts because of the power of attorney and the way they were set up. Well, isn't that a question of proof and stuff? I think it's a question, Your Honor, that they allege in their complaint directly. But more importantly, they also allege that they didn't know about any of these accounts and that the entire purpose — So what does that mean? I mean, so my father sets up an account for me, and it's in my name. I still own it, even though I don't know it. That doesn't mean anything to me. Your Honor, I think that — His knowledge is completely irrelevant. I think the answer to your question, Your Honor, is because the entire scheme from the beginning was designed to be fraudulent. What the plaintiffs' allegations are in their Second Amendment complaint, and if you look, paragraphs — So if the scheme is fraudulent and it's constructed offshore, it immunizes — it immunizes their access to U.S. bank accounts? Is that it? No, Your Honor. What we're saying is that the entire vehicles through which these funds were placed and then laundered into the United States were fraudulent from the outset. What plaintiffs' allegation is, is that my clients took money from legitimate companies that are plaintiffs in this case, T&V, Toro, and Milano. They diverted them from their proper legitimate use and put it — Let me ask you this. Why would they put it in his name here? Do you think that — I mean, presume that — presume you're right, that the fraudulent scheme was concocted in Chile. Okay. And so — and we know that they did put the money into accounts that bore his name, right, or he allegedly would have access to. They bore the name of Finterre, which is alleged in the complaint to have been ultimately beneficially owned by the plaintiffs. Okay. So then the fact that there were accounts in New York under their theory is an integral part of the fraud, isn't it? No, Your Honor, because the — Then why would one — why they would have just put them in Alaska — in your client's name? It seems to me — it seems to me that by having them in his name, if for some reason or a company to which he's allegedly an owner, that's some purpose to that fraud. Your Honor, I think that — I mean, you may — you may dispute it and say it doesn't make any sense or that it's a lousy, fraudulent scheme, but their theory is, is that it was part of his fraudulent scheme. But again, Your Honor, I think that conflates the injury and the conduct requirement. The injury was built — No, you don't think it's part of the scheme. Your Honor, I think that the scheme was effectuated when the money was taken from the plaintiffs to begin with and put into fraudulent — allegedly fraudulent vehicles in Chile. From that point, you're right, Your Honor. My clients could have put that money anywhere. The fact that they brought it to New York doesn't change the fact that under Judge — It doesn't change the fact that they put it into an account that — to which the plaintiff would have had — might have had access? We say no, Your Honor, because under the test that Judge Cabranes laid out in the This money didn't — wasn't here before placed here by the plaintiffs, right? It was brought here by the defendants. And so the only connection between New York and this money was brought about by the acts of the defendants after the funds were wrongfully misappropriated. And remember, it was done all through the guise of fraudulent schemes and put into fake companies, which the allegations in the Second Amendment complaint make clear serve no legitimate purpose. I just can't get my head around why they would put it in the benefactor's name. I just can't get my head around that. It just doesn't make any sense to me, unless it's part of the scheme. Well, Your Honor, remember, it was — it's in the name of this company called Finterre. Right. And the allegation of the way that plaintiff even came to be the owner, beneficially, of Finterre was alleged to be fraudulent in the case. They created this sham fund called Anacapri purportedly. Anacapri was then caused to acquire this British Virgin Islands company called Finterre. And then the money was set up for the purpose of taking money that had been used to form Anacapri in Chile from the legitimate companies, as alleged by the plaintiffs, funnel it into New York for the purpose of then bringing it — transferring it between New York accounts and out of New York into accounts held by the defendants. The whole reason the money was in the first — The more you move money, the harder it is to follow. That may be the case, Your Honor, but — All the wonderful problems of having money. These are not my problems. Nor mine, Your Honor. I'm a singular savings account fellow myself. I bank with Citi, and they're all here in New York. I definitely would suffer a domestic injury if my money was taken. Go ahead. Your best argument, it seems to me, in their — it has a — it gives one pause, is that, okay, the complaint itself says that the plaintiff — that these accounts were concealed, the existence, from the plaintiff, and the scheme was hatched in Chile, and the money just went into a nominee account. They happened to put it into a nominee account that belonged to the estate. But the — it was essentially — there was a serious interference with the property in Chile, and this was just the follow-on. Yes, Your Honor. And that was my point when I said that the money went misappropriated. Taken from its proper use, right? The whole scheme, as alleged by the plaintiffs in their complaint, and it's — you know, it's right there in — in writing, is the — the whole purpose was to take this money from proper uses that had previously been put to use in Chile and remove it, put it into these fake companies that serve no legitimate purpose, and then the way that defendants happened to take this pot of money was to route it through New York and take it for themselves, allegedly, of course. And that, under Judge Cabranes's opinion, the last time, is not enough to create the domestic injury. And I should say, Your Honor — But the — the fact that the plaintiff could have accessed those funds, if he found out he had these accounts that — or that belonged to a company that he owns, that are part of his estate, he still had a capacity to take control of them. Perhaps, Your Honor. But that doesn't mean he hasn't suffered an injury already, because the money could have been doing what it should have been doing, according to the plaintiffs in Chile, all the while. The fact that it might have been more profitable elsewhere doesn't make it a theft. It makes it a breach of a fiduciary responsibility. But a theft occurs when, ultimately, you — your client allegedly took total control of it, which is where — which has all occurred in New York, by the way, with fraudulent wire transfers and instructions to pay bills that were allegedly fraudulent bills and manufactured legal services. And so why aren't those wire transfers integral and important with regard to the scheme? Because — well, Your Honor, first, I think that that goes to the conduct piece and not the injury piece. Well, that's the problem with Judge Daniel's opinion. Judge Daniel's opinion says, well, it's where the scheme is hatched. But the — but wire fraud has three elements. It's not just the scheme. And I have a hard time understanding how you measure whether the locus and the focus of the statute, where you — where you focus on only one element. Why not focus on all three of scheme to the fraud, money or property of the object of the scheme, and the use of the mails to further the scheme? Your Honor, I think on the conduct piece, a couple of things to answer your question. First — Well, certainly it can't be — it can't be Daniel's — Judge Daniel's test, can it? Your Honor, Judge Daniel's used a test that other district courts have used. I think, and as we said in our papers — That will — that will immunize every fraud — offshore fraudster. Every offshore fraudster. All they have to do is sit in the Cayman Islands or someplace else, in Chile, and the concoct schemes, run money through New York banks and steal it, and then they'll be — they'll — the reach of the United States will not be able to get to them. U.S. courts won't be able to reach them. Your Honor, we're not — we think that under any of the tests that have been discussed in the papers, that the conduct — and again, we admit there was an injury with respect to the Afghan trust scheme here in the United States. But the conduct relevant to that specific scheme — and again, in the papers, plaintiffs try and broaden this scheme out to cover everything that's alleged in their complaint. But when you look at just the New York trust account scheme, the Afghan trust, where the money was here, a new account was created, and wires were sent to transfer it, the vast majority of the conduct that was relevant to that scheme, the purpose of which was to — was to pay fake fees in Chile to Chileans for services, legal and management services, came from Chile. The scheme was hatched there. It was hatched in 1999 by the power of attorney to give Mr. Yoror-El-Saka and Mr. Silva, the legal lawyer in Chile, power. The — the power of attorney was executed outside of the United States, which we know because Mr. Baskin-Yon wasn't allowed to come to the United States. We know — Breyer. I understand all that. Goldstein. Yes. Breyer. But if the money's here, and if the money's in Baskin-Yon's name, then it seems to me that it's all well and good that somebody — that somebody wants it and directs it to end up in Chile. But if it's — if it's — if it's — if it's in my pocket, that's where you're stealing it from. If it's in my bank account in — in Rochester, New York, that's where you're stealing it from, isn't it? Goldstein. Your Honor, no. I think that you steal — I think that you're stealing the money when you take it from what you intended the money to do. If your money is sitting in a bank account in Rochester and it's making 10 percent interest — Breyer. Even if you put it in my name and you — and you — you put it in my account someplace else and it's my account? Goldstein. Yes, Your Honor, because you're not — because — because you're not actually — you don't have — Breyer. It's an interesting understanding of property. Goldstein. It's — it's — Breyer. I don't think that does well in Property 101. Goldstein. I think the question here is the misappropriation and where it was diverted from its proper use. Sotomayor. Misappropriation could be a breach of a fiduciary trust, like I said before, but it's not theft in the sense of a one-wise use of the money. It's not a theft. But — and that's the problem. It's in — if — if you concede — do you concede that — that there's an arguable case, a — a colorable argument to be made that these accounts were accessible by Baskin in New York? Goldstein. I think under the allegations in their complaint, they've alleged them not to be. Sotomayor. It's a plausible — a plausible allegation? Goldstein. One could make that allegation. Sotomayor. It's a 12b6 motion, right? Goldstein. Well, correct, but they haven't made that allegation. They have, in fact, made the allegation that he was incapable of accessing it because of his physical condition. He didn't know about it, and that — Sotomayor. I'm not talking about him personally. I'm talking about legally. Were the — were the accounts accessible from the standpoint of the bundle of rights that he held with regard to that account? Goldstein. Your Honor, I — I don't know if under the — under the way that the accounts were set up if that's possible. Perhaps he could have rescinded the power of attorney and then gotten power to — to access them. I don't think under the way that they have pleaded their complaint that one can conclude that he had access in real time to those accounts. Roberts. I've given you a real hard time. I — but I appreciate the — the ability with which you answer the questions. Goldstein. Your Honor, I've gone over my time. I don't know if you have additional questions or — Sotomayor. I think — I think not. Thank you very much. Goldstein. Thank you, Your Honor. Sotomayor. We'll take — we'll hear rebuttal. Thank you very much. Your Honors, Mr. Flugman said that the — the transfers were fraudulent from the outset and said that the misappropriation occurred when the money was taken from the plaintiffs, quote-unquote, to begin with in Chile. And I just want to direct Your Honors to what the defendants actually said before when they were — when we were below — in the court below, and they specifically defended against our prior allegations in the first amended complaint in the — in their declaration. And that's at A240, back before we knew that FinTERR was, in fact, owned by the estate. And what they said was that the so-called FinTERR laundering scheme that allegedly took place between 2003 and 2009 is totally fabricated, given that during that time, FinTERR was owned by JYB. The entire defense before — And did they also make — maybe not in the declaration, but elsewhere — representations in defending in Chile that they — the Terrascona accounts also were owned by the estate? They have not discussed that in any sworn under penalty of perjury. We, of course, allege that in the complaint, that they were all owned, based on the documents that we received from the bank. But the point that I'm making here is that when it was convenient before, their whole argument was, hey, the plaintiffs own this. They own FinTERR, so we can't be guilty of anything. And now they're saying, oh, you know, Fin — it doesn't matter. What — we really took the money earlier. But, in fact, that's not true, because while the money was in the possession and in the name of and owned by my clients, we had no injury. Your duty is to plausibly plead a domestic injury at this point. And the — and the argument is these accounts are now alleged to have been in the estate's name, my client had access to them, and monies were removed from those accounts, and that's enough. I'm entitled to discovery. Correct. And with respect to the domestic conduct piece, if I may, I really think there's a mistaken emphasis on the part of Mr. Flugman in terms of this notion of being hatched from Chile. When the — when courts look at, for example, in the venue context of mail-and-wire fraud, they'll look at if any element of that crime was completed in the United States. And each one of these elements that we have already talked about was completed in the United States. All of those transfers that I talked about, all of the e-mails, all of the wire authorizations, all of the phone calls, all of the conversations that they had with bank employees in the United States in order to steal money out of the United States, all of that was directed at New York. That's completion in New York. And so the fact that it happened to be initiated from outside of this jurisdiction really should have no bearing on whether the conduct is domestic in the sense of what the statutes are intended to — to cover. And just as a final — as a final word, Your Honors, I just want to note, 11 days from today, it will be four years since we filed this case. Four years. And we have not even gotten out of the gate due to the motion practice and this — and the district court's stay of discovery. We've alleged domestic injuries. We've alleged domestic violations of the mail-wire and bank fraud statutes. We've alleged a pattern of racketeering. We've stated a RICO claim. We think the federal and state law claims should be reinstated. The district court should be reversed. And we also ask that if you do reverse the case, that on remand, the district court be directed to move this case forward at long last and expeditiously, that the defendants be directed to answer the complaint, and that the stay of discovery be lifted, in keeping with the old adage that justice delayed is justice denied. Thank you very much. Thank you both. Very well argued on both sides. Thank you. Nicely argued. Very nicely argued. And that is the only case on the calendar. So I'll ask the clerk to adjourn. Thank you.